REVLON REALISTIC, INC., demandante y recurrida, *v.* LAS AMERICAS TRUST COMPANY, demandada y recurrente, y MAGDAMARI AGENCIES, INC., tercera demandada.

*Número:* RE-88-91 *Resuelto:* 15 de marzo de 1994

*Hernando A. Rivera*, abogado de la parte recurrente; *Néstor Surán*, del bufete *McConnell, Valdés, Kelly, Sifre, Griggs & Ruiz Suria*, abogado de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

Tenemos, por primera vez, la ocasión de dilucidar normativamente algunos de los aspectos principales relativos al uso de cartas de crédito en la vida comercial de Puerto Rico, conforme la legislación aprobada en 1983.

## I

Desde 1971 Magdamari Agencies Corporation (en adelante Magdamari) era la distribuidora en Puerto Rico de los productos de Revlon Realistic, Inc. (en adelante Revlon). Para 1983, Revlon le requirió a Magdamari una garantía bancaria en favor de Revlon o de cualquiera de sus subsidiarias para afianzar el pago de la mercancía que le supliesen a Magdamari. Ésta gestionó entonces que Las Américas Trust Company (en adelante L.A.T.Co.) expidiese dicha garantía en favor de Revlon. Ésta consistía de una carta de crédito irrevocable por la suma máxima de $150,000. La garantía aludida fue expedida el 24 de junio de 1983 y estuvo vigente hasta el 23 de junio de 1984, y fue renovada el 11 de junio de 1984 con fecha de vencimiento al 15 de junio de 1985. Surge de dicha carta de crédito que la única condición que había que cumplir para su cobro era presentar un giro a la vista, junto con el original de la carta de crédito.

El 13 de junio de 1985, dos días antes de que venciese la carta de crédito, Revlon presentó a L.A.T.Co., para cobro, un giro en su favor por $150,000, junto con el documento

que contenía la renovación de la carta de crédito referida. El presentante del giro le expresó al presidente de L.A.T.Co. que Magdamari adeudaba $177,298.46 a Revlon, de los cuales estaban en disputa unos $13,000. L.A.T.Co. se negó a honrar el giro. Al día siguiente, Revlon requirió nuevamente el pago de su giro a L.A.T.Co., el cual le denegaron otra vez.

Luego de la presentación del giro, Revlon recibió el pago de un cheque expedido en su favor por Magdamari de $80,372.92. Así mismo, Revlon reconoció créditos a Magdamari por $21,646.60. Según Revlon, el pago del cheque más los créditos redujo la deuda anterior de Magdamari a $67,218.90.

En vista de que L.A.T.Co. se había negado a honrar su giro, el 23 de mayo de 1986 Revlon inició la acción de autos para cobrar la deuda aludida de $67,218.90, más los intereses legales a base de la carta de crédito referida. L.A.T.Co. oportunamente contestó la demanda y presentó una demanda contra tercero en cuanto a Magdamari. Ésta luego presentó una reconvención contra Revlon fundamentada en las disposiciones de la Ley Núm. 75 de 25 de junio de 1964 (10 L.P.R.A. sec. 278 *et seq.*). Alegó que había sufrido daños porque Revlon había terminado unilateralmente su contrato de distribución exclusiva y había menoscabado la relación entre ellos sin justa causa.

Así las cosas, tanto L.A.T.Co. como Revlon solicitaron una sentencia sumaria parcial. El tribunal de instancia acogió los planteamientos de Revlon, y mediante Sentencia de 9 de febrero de 1988, declaró con lugar su solicitud de sentencia sumaria, condenó a L.A.T.Co. a pagar a Revlon $67,218.90, más los intereses legales a partir de 13 de junio de 1985 hasta su pago total, más las costas y $10,000 de honorarios de abogado por su temeridad.

Inconforme con dicha sentencia, L.A.T.Co. recurrió ante nos mediante un recurso de revisión. Planteó el que erró el tribunal de instancia:

[1.] ... al concluir que [al] 13 y 14 de junio de 1985, Magda-mari no había pagado a Revlon las facturas. núm. 06-4470-2, 112172-1 y 020195-0 por [el] total de $84,029.40 y podía reclamar su pago al girar contra la carta de crédito núm. 0195.

[2.] ... al concluir que no medió "fraude en la transacción".

[3.] ... al dictar sentencia sumaria en favor de Revlon y al no dictar Sentencia Sumaria en favor de LATCO.

[4.] ... al hacer una determinación de temeridad y fijar la cuantía de honorarios de abogados en $10,000.00.

El 7 de abril de 1988 emitimos una resolución en la que ordenamos elevar el expediente original de este caso, a los fines de revisar la sentencia dictada por el tribunal de instancia el 9 de febrero de 1988.

## II

Antes de comenzar la discusión de los errores alegados, conviene delimitar brevemente el trasfondo normativo aplicable al caso ante nos.

█ Aplican al caso de autos las disposiciones de la Ley de Cartas de Crédito de Puerto Rico, Ley Núm. 95 de 4 de junio de 1983 (7 L.P.R.A. sec. 1601 *et seq.*). La Asamblea Legislativa, como parte de la revisión de la legislación mercantil de Puerto Rico, decidió adoptar en nuestra jurisdicción disposiciones similares a las que contiene el Art. 5 del *Uniform Commercial Code* sobre cartas de crédito. Véase la Exposición de Motivos de la Ley Núm. 95 de 4 de junio de 1983, Leyes de Puerto Rico, pág. 249.

█ En vista de que nuestra legislación sobre cartas de crédito es relativamente reciente, que procede del derecho norteamericano, y debido a que no existe jurisprudencia nuestra sobre el particular, incorporamos —según sea apropiado— las normas y criterios desarrollados judicial o doctrinalmente en la jurisdicción de origen. *Colgate-Palmolive v. Mistolín*, 117 D.P.R. 313, 323 (1986); *Garriga Trad. Co., Inc. v. Centrum Pack. Corp.*, 107 D.P.R. 519, 522 (1978).

■ A tenor con la Ley Núm. 95, *supra*, una carta de crédito es un compromiso contraído por un banco u otra persona a solicitud de un cliente, conforme al cual el emisor de la carta aceptará o pagará giros u otros requerimientos de pago que le presente el beneficiario de la carta, siempre que se cumplan las condiciones especificadas en la carta de crédito. 7 L.P.R.A. sec. 1603(1)(a). Esta ley define al emisor como el banco que emite la carta de crédito; al beneficiario, como la persona que tiene derecho, a base de los términos de la carta de crédito, de girar o de requerir el pago, y al cliente, como el comprador que obtiene —de un emisor— la emisión de la carta de crédito. 7 L.P.R.A. sec. 1603(1), sub incisos (c), (d) y (g).(¹)

■ La carta de crédito puede ser "documental" o "simple". Si es documental, la carta de crédito especifica los documentos que el beneficiario tiene que presentar para girar contra el crédito.(²) De ordinario, la producción de los documentos requeridos es de estricto cumplimiento.(³)

■ En cambio, un crédito simple o incondicional no requiere la producción de documentos con la carta de

---

(¹) Al aplicar estos conceptos al caso ante nuestra consideración, tenemos que Las Americas Trust Company (en adelante L.A.T.Co., es el emisor, Revlon Realistic el beneficiario y Magdamari Agencies Corporation (en adelante Magdamari) el cliente.

(²) La Sec. 3(1)(b), 7 L.P.R.A. sec. 1603(1)(b), define *giro documental* o *requerimiento documental de pago* como uno condicionado a que su aceptación o pago sólo pueda exigirse mediante la presentación de uno o varios documentos. También define *documento* como "cualquier escrito, incluyendo los que evidencian un título, o un valor, factura, certificado, aviso de incumplimiento y otros similares". 7 L.P.R.A. sec. 1603(1)(b).

(³) Luego de examinar el texto de la Sec. 14(1) de nuestra ley, 7 L.P.R.A. sec. 1614(1), y su equivalente en el *Uniform Commercial Code*, Sec. 5-114(1), encontramos que no existe una guía expresa para determinar cuándo se entenderá que los documentos presentados cumplen con los términos de la carta de crédito. Ninguna de estas secciones señala si es necesario el "cumplimiento estricto" de los términos de la carta o si es suficiente que el cumplimiento sea "sustancial" o "razonable". La jurisprudencia norteamericana tampoco ha establecido un criterio uniforme para resolver esta controversia. Sin embargo, la gran mayoría de los tribunales de esa jurisdicción han aplicado el criterio de "cumplimiento estricto". El comentario erudito sobre esta materia también favorece la utilización de dicho criterio. Véase J.J. White & R.S. Summers, 2 *Uniform Commercial Code* Sec. 19.5 (1988).

crédito.[4] El beneficiario sólo tiene que presentar un giro o requerir el pago del crédito sin acompañar documento alguno. *Housing Securities, Inc. v. Maine Nat. Bank*, 391 A.2d 311 (1978); *Sunset Investments, Inc. v. Sargent*, 278 S.E.2d 558 (1981). Por su parte, el emisor sólo tiene que examinar el giro para proceder entonces a su pago. *Newvector Communications, Inc. v. Union Bank*, 663 F. Supp. 252, 255 (D. Utah 1987).

■ Uno de los principios normativos fundamentales referente a las cartas de crédito es que éstas vinculan al emisor y al beneficiario de la carta con una independencia total del contrato principal entre el cliente y el beneficiario.[5] Bajo este principio de independencia, el emisor de una carta de crédito deberá pagar un giro o requerimiento documental de pago que satisfaga las condiciones de la carta de crédito sin tener en cuenta para ello los términos del contrato principal suscrito entre el cliente y el beneficiario. *Andy Marine, Inc. v. Zidell, Inc.*, 812 F.2d 534, 537 (9no Cir. 1987).

Este principio aparece consignado en la Sec. 14(1) de la Ley Núm. 95, *supra*, que dispone lo siguiente:

> *Sec. 1614. Obligaciones y privilegios del emisor; derecho a reembolso.*
> (1) Todo emisor deberá aceptar o pagar un giro o requerimiento documental de pago que satisfaga las condiciones del crédito a que se refiere sin tener en cuenta si las mercancías o documentos relativos al mismo satisfacen o no los términos del contrato principal de venta u otra transacción entre el cliente y el beneficiario. El emisor no quedará relevado de aceptar o pa-

---

[4] A documentary letter of credit requires a beneficiary to present a draft (called a documentary draft) along with documents that specifically conform to the terms of the credit. By contrast, a 'clean' letter of credit requires the beneficiary to present only a draft and no other documents. *All Season Ind. v. Tresfjord Boats A/S*, 563 N.E.2d 174 (1990). Véase, además, *American Coleman v. Intrawest Bank of Southglenn*, 887 F.2d 1382 (10mo Cir. 1989).

[5] "Letter of credit law is premised on the principle that the letter of credit is independent of the underlying contract. U.C.C. sec. 5-114, official code comment Part 1." *TMTI v. Empresa Nacional de Comercialización*, 829 F.2d 949, 954 (9no Cir. 1987).

gar dichos giros o requerimientos documentales de pago por razón de una condición general y adicional a los efectos de que todos los documentos deberán ser a su satisfacción, pero podrá requerir que determinados documentos, que se especifiquen, se presenten a su satisfacción. 7 L.P.R.A. sec. 1614(1).

Lo anterior no obstante, cuando ocurre *fraude* en los documentos o en la transacción, la regla aludida de independencia de las cartas de crédito sufre una excepción.([6]) Acerca de este aspecto, la Sec. 14(2)(b) de la Ley Núm. 95, *supra*, provee lo siguiente:

*Sec. 1614. Obligaciones y privilegios del emisor; derecho a reembólso.*

(2) Salvo pacto en contrario, cuando de la faz de los documentos éstos parezcan cumplir con los términos de un crédito pero, como cuestión de hecho, un documento de los requeridos no se ajusta a las garantías convenidas en la negociación o transferencia de un documento que evidencia un título o un valor o si aquél fuese falsificado o fraudulento o ha mediado fraude en la transacción:

(a) el emisor deberá aceptar o pagar el giro o requerimiento documental de pago si así se le exige por un banco negociador u otro tenedor del giro o requerimiento documental de pago que lo hubiere tomado a tenor con el crédito y bajo circunstancias que lo conviertan en un tenedor de buena fe o en su caso le conviertan en una persona a quien se le ha negociado debidamente un documento que evidencia un título o en un comprador *bona fide* de un valor; y

(b) en todos los demás casos en lo que respecta al cliente, un emisor que actuare de buena fe podrá aceptar o pagar el giro o requerimiento documental de pago aun cuando el cliente le haya notificado la existencia de fraude, falsificación u otro defecto que no surja de la faz de los documentos pero un tribunal de jurisdicción competente podrá prohibir dicha aceptación o pago.

(3) Salvo pacto en contrario, todo emisor que ha aceptado o pagado debidamente un giro o requerimiento documental de

---

([6]) Generally, a letter of credit is independent of the underlying contract. When a beneficiary submits documents that facially conform to the condition required for calling on the letter, the issuer must pay. Under UCC sec. 5-114(2), however, an issuer may dishonor a draft in three situations: (1) if the beneficiary has submitted a forged document, (2) if the beneficiary has submitted a fraudulent document, or (3) if there has been fraud in the transaction. *Eastland Bank v. MassBank for Savings*, 767 F. Supp. 29 (D. R.I. 1991).

pago tendrá derecho al reembolso inmediato de todo pago hecho a tenor con el crédito y, en los casos de giros o requerimientos aceptados con vencimiento futuro, a que se le pague en fondos efectivos disponibles no más tarde del día anterior a su vencimiento. 7 L.P.R.A. sec. 1614(2) y (3).

█ Surge de la citada Sec. 14 que el emisor tiene que inspeccionar los documentos que acompañan el requerimiento de pago para ver si cumplen con las condiciones especificadas en la carta de crédito. Si se cumplen, el emisor tiene que pagar. Así lo exige el principio de independencia que le da fuerza y vitalidad a la carta de crédito como un instrumento de financiamiento. Sin embargo, aunque de la faz de los documentos éstos parezcan cumplir con los términos del crédito, si como cuestión de hecho un documento de los requeridos es "falsificado o fraudulento o ha mediado fraude en la transacción", entonces el emisor deberá pagar el giro sólo si el presentante es propiamente un tenedor de buena fe. 7 L.P.R.A. sec. 1614(2).

Por otro lado, aun si el presentante del giro no cualifica como tenedor de buena fe, el emisor que actuare de buena fe tiene la opción de pagar el giro aunque el cliente le haya notificado la existencia de fraude, falsificación u otro defecto que no surja de la faz de los documentos. Por su parte, el cliente, antes de que el emisor acepte o pague el giro, puede solicitar de un tribunal de jurisdicción competente que prohíba dicha aceptación o pago. La solicitud de interdicto del cliente tiene que ajustarse a los requisitos de la Regla 57 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

█ Esta excepción de la Sec. 14(2)(b), *supra*, se activa, de ordinario, si antes de que el beneficiario presente la carta de crédito el cliente le notificó al banco emisor de "la existencia de fraude, falsificación u otro defecto que no surja de la faz de los documentos". 7 L.P.R.A. sec. 1614(2)(b). El emisor entonces tiene la opción de pagar o desairar el giro. En ausencia de esta notificación previa, bajo el principio de independencia de las cartas de crédito

el emisor no puede rehusar la aceptación o el pago del giro si los documentos se ajustan a lo requerido por el crédito. En *West Virginia Housing Development Fund. v. Sroka*, 415 F. Supp. 1107; 1114 (D. Penn. 1976), el tribunal explicó este requisito de notificación de la manera siguiente:

> While this language is not as clear as it could be, the court understands it to mean the following. If the bank has received no notice of fraud, forgery, or of a defect on the instrument, it has no privilege to dishonor. If the bank receives notice of any one of these defenses, it has the option to either dishonor or to honor.

Aunque el propio texto de la ley y la jurisprudencia norteamericana sólo contemplan que el emisor adquiere el conocimiento de la existencia de fraude o falsificación a través de la notificación hecha por el cliente, algunos comentaristas han planteado que no debe descartarse la posibilidad de que el emisor pueda adquirir conocimiento de la existencia de fraude por algún otro medio y surja igualmente su opción de no aceptar o pagar al beneficiario la carta de crédito. Véanse: 3 *Anderson on the Uniform Commercial Code* Secs. 5-114:8 y 5-114:9, págs. 418–419 (2da ed. 1971); J. White y R. Summers, *Handbook of the Law Under the Uniform Commercial Code* Sec. 18-6 (1980).

## III

Vistos los hechos del caso de autos, a la luz de la exposición doctrinal antes descrita, resolvemos que L.A.T.Co. actuó erróneamente al no pagar el giro en cuestión cuando Revlon lo presentó para pago. De la prueba ofrecida por las partes no surge que Magdamari le hubiera notificado a L.A.T.Co. la alegada "existencia de fraude" en la transacción antes de que Revlon hubiese presentado su giro para pago. Tampoco surge del expediente que L.A.T.Co. adquiriera el conocimiento de la existencia de dicha defensa de

ningún otro modo. No es hasta después del desaire del giro que L.A.T.Co. invoca la Sec. 14(2)(b) de la Ley Núm. 95, *supra*, y tilda de "fraude" la diferencia alegada que existía entre Magdamari y Revlon. En vista de estos hechos, no surgió en favor de L.A.T.Co. la opción de no honrar la carta de crédito presentada.

Por otro lado, la carta de crédito en cuestión, expedida por L.A.T.Co. en favor de Revlon en el caso de autos, es simple o incondicional, por lo que no se requería la presentación de documento alguno. Según los términos de dicha carta, lo único exigido para su pago era la presentación de un giro a la vista junto con la carta de crédito original, requisitos que Revlon cumplió. L.A.T.Co. estaba obligada a pagar el giro cuando Revlon lo presentó sin examinar el contrato principal suscrito entre Revlon y Magdamari por así prohibirlo el principio de independencia consagrado en la Sec. 14 de la Ley de Cartas de Crédito de Puerto Rico, *supra*.

 Aun asumiendo, para propósitos de la discusión, que L.A.T.Co. hubiese invocado —previo la presentación del giro— el conocimiento de la existencia del alegado fraude en la transacción, las supuestas actuaciones fraudulentas de Revlon no justificaban que L.A.T.Co. no honrara la carta en cuestión. Reiteradamente la jurisprudencia norteamericana ha resuelto que, bajo su Sec. 5-114(b)(2), el tipo de fraude que justifica el no honrar una carta de crédito debe ser de naturaleza tan perversa que vicie toda la transacción.([7]) Ello, evidentemente, no ocurrió aquí.

---

([7]) "The exception is construed narrowly and applies only in circumstances so egregious in nature as to vitiate the entire underlying transaction so that the 'legitimate purposes of the independence of the issuer's obligation would no longer be served'." *Airline Reporting v. First Nat. Bank of Holly Hill*, 832 F.2d 823, 828 (4to Cir. 1987).

Véanse, además: *Interfirst Bank v. First Fed. Sav. & Loan*, 747 P.2d 129, 134 (Kan. 1987); *Intraworld Industries, Inc. v. Girard Trust Bank*, 336 A.2d 316, 324–325 (1975); *N.Y. Life Ins. Co. v. Hartford Nat. Bank & Trust Co.*, 378 A.2d 562, 567 (1977); *Colorado Nat. Bank, etc. v. Bd. of County Com'rs*, 634 P.2d 32, 39 (Colo. 1981).

L.A.T.Co. decidió no honrar el giro. Alegó para ello tres razones: (1) que las facturas Núms. 06-4770-2, 112172-1 y 020195-0 por el total de $84,029.40 habían sido pagadas por el cheque Núm. 307 de 14 de mayo de 1985; (2) que Revlon había alterado los términos del crédito para el pago de una factura de 90 días a 70 días, y (3) que ciertos créditos por concepto de concesiones promocionales eran de carácter automático.

Ninguna de estas tres discrepancias constituyen el fraude perverso y dañino que exige la Sec. 14(2)(b) de la Ley Núm. 95, *supra*. En cuanto a la primera, según la prueba documental que consta en autos, al 13 de junio de 1985 Revlon aún no había cobrado el referido cheque Núm. 307, pero una vez el cheque fue cobrado, Revlon le dió un crédito a Magdamari de inmediato, por lo cual este asunto ya no era relevante.

En cuanto al cambio del término de facturación de 90 a 70 días, no cabe duda de que éste refleja una discrepancia con el contrato principal de venta, pero ello no es base suficiente para invocar las disposiciones de la Sec. 14, *supra*. El hecho de que exista una disputa entre el beneficiario y el cliente de la carta de crédito no constituye "fraude en la transacción", ya que la obligación del emisor de honrar dicha carta, como regla general, es completamente independiente de las actuaciones del beneficiario con relación al cumplimiento del contrato entre éste y el cliente.[8]

Surge de la prueba que este cambio en el término de pago ocurrió en la factura enviada a Magdamari el 29 de

---

[8] "The obligation of the issuer of a letter of credit to honor the letter is wholly separate from the beneficiary's compliance with the terms of the underlying contract and is dependent solely on the terms and conditions contained in the letter of credit." *Raiffeisen-Zentralkasse v. First Nat. Bank in Aspen*, 671 P.2d 1008, 1010 (Colo. 1983).

Por esta razón se ha dicho, por ejemplo, que en una acción de sentencia declaratoria no deben considerarse en sus méritos la reclamación de un cliente en una disputa sobre el contrato entre éste y el beneficiario de una carta de crédito. Véase *B.E.I. Intern. Inc. v. Thai Military Bank*, 978 F.2d 440 (8vo Cir. 1992).

marzo de 1985, y no fue hasta tres meses más tarde aproximadamente, cuando Revlon presenta el giro, que Magdamari por vez primera indica que no está de acuerdo con el cambio reflejado en la factura. Por otra parte, Revlon alegó que este cambio había sido acordado verbalmente entre las partes. Tratándose en el caso de autos de una carta de crédito simple o incondicional, los méritos de esta disputa entre Revlon y Magdamari resultan irrelevantes a los fines de determinar la responsabilidad de L.A.T.Co. En ausencia de un fraude real en la transacción de crédito, L.A.T.Co. estaba obligada a honrar la carta de crédito cuando fue presentada para su pago.[9]

En cuanto a la reclamación de los créditos por concepto de concesiones promocionales, no cabe duda de que Magdamari tenía derecho a recibir una cantidad equivalente al 15 por ciento de las compras netas. Sin embargo, la Cláusula 5 del contrato principal de venta entre Revlon y Magdamari establece expresamente que dichos créditos no serían pagados automáticamente, sino luego del cumplimiento de ciertas condiciones.[10]

A base de estas consideraciones y teniendo en cuenta que aquí no aplica la doctrina de fraude formulada en el caso *Emery-Waterhouse Co. v. R.I. Hosp. Trust Nat. Bank*,

---

[9] "In the case of the clean letter of credit, the issuer's only obligation is to ... inspect the draft presented to ensure that it is not a fraud or forgery[; t]here can be no issue as to whether documents conform to such a letter." *All Season Ind. v. Tresfjord Boats A/S*, 563 N.E.2d 174 (1990).

"[The issuing bank's obligation] to pay the beneficiary of a letter of credit is independent of the underlying transaction. ... [I]f the beneficiary of a "clean" letter of credit [one requiring presentation of a draft and no other documents] presents a draft to the bank, the bank must pay the beneficiary without regard to the beneficiary's performance on its underlying contract with the bank's customer, and the only defense the bank may assert is fraud in the formation of the underlying contract." *Baker v. National Boulevard Bank of Chicago*, 399 F. Supp. 1021, 1024 (D. Ill. 1975).

[10] Específicamente, la Cláusula 5 de dicho contrato dice lo siguiente:

"Up to 15% of actual net purchases will be made available for these purposes but will not be paid automatically. Only when specific sales and promotional activities have been jointly agreed upon, budgeted, and receipted will this money be released (after it has been earned) to cover the expenses." *Exhibit* 1, pág. 2.

757 F.2d 399 (1er Cir. 1985), resolvemos que L.A.T.Co. actuó erróneamente al no honrar el giro referido.([11])

## IV

En el caso de autos, la parte recurrente alegó que existía una controversia real sobre hechos materiales y que no procedía dictarse la sentencia sumaria en favor de Revlon. No le asiste la razón.

Reiteradamente hemos señalado que el mecanismo procesal de sentencia sumaria persigue el propósito de obtener un remedio rápido y eficaz por vía de sentencia, cuando la parte que la promueve puede acreditar ante el tribunal que no existe una controversia genuina en relación con los hechos materiales del litigio. *Tello, Rivera v. Eastern Airlines*, 119 D.P.R. 83 (1981).

En este caso no hay controversia sobre los hechos materiales pertinentes a la reclamación de Revlon. No puede cuestionarse que existía una deuda garantizada que L.A.T.Co. estaba obligada a pagar sin examinar los términos del contrato entre Revlon y Magdamari. No se configuró en este caso el tipo de fraude que requiere la Sec. 14(2)(b) de la Ley Núm. 95, *supra*. Según hemos expuesto, éstos constituyen los únicos hechos materiales en este caso. En vista de que no hay controversia respecto a ellos,

---

([11]) L.A.T.Co. alegó que no estaba obligado a honrar el giro por entender que le era de aplicación la doctrina de fraude que aparece en el caso *Emery-Waterhouse Co. v. R.I. Hosp. Trust Nat. Bank*, 757 F.2d 399 (1er Cir. 1985).

No le asiste la razón. Dicho caso es distinto al de autos. En el mismo la carta de crédito requería, contrario a la que nos ocupa, que antes de cobrarse se presentara al emisor una certificación de que la deuda en cuestión estaba vencida como resultado del incumplimiento del deudor, que se había hecho un requerimiento de pago a éste y que dicho pago no había sido recibido.

En el caso *Emery-Waterhouse Co. v. R.I. Hosp. Trust Nat. Bank*, supra, se cobró una deuda que no existía al falsificarse la certificación antes mencionada. No obstante, a pesar de que se cobraron ciertas facturas fraudulentas, el tribunal ordenó la devolución de las cantidades en cuestión. En dicho caso, el tribunal entendió que los actos fraudulentos allí acontecidos justificaban la excepción de fraude establecida en la Sec. 5-114(b)(2) (equivalente a nuestra Sec. 14(2)(b)).

procedía dictarse la sentencia sumaria tal y como lo hizo el tribunal de instancia.

## V

■ En cuanto a los honorarios de abogado, la norma prevaleciente es que éstos se conceden por temeridad y dependen de la discreción del tribunal sentenciador. *Boyd v. Tribunal Superior*, 101 D.P.R. 651, 662 (1973); *Montañez Cruz v. Metropolitan Cons. Corp.*, 87 D.P.R. 38, 40 (1962). La parte recurrente no ha demostrado que el foro de instancia incurrió en abuso de discreción al imputarle temeridad, y los hechos del caso tienden a apoyar la determinación del tribunal sentenciador.[12]

■ En relación con la cuantía impuesta por honorarios de abogados, reiteradamente hemos resuelto que no intervendremos con ésta en apelación a menos que sea excesiva, exigua o constituya un abuso de discreción. *Corpak, Art Printing v. Ramallo Brothers*, 125 D.P.R. 724 (1990); *Ramírez v. Club Cala de Palmas*, 123 D.P.R. 339 (1989).

La parte recurrente alega que la cuantía fijada por el tribunal de instancia es excesiva. Le asiste la razón.

■ En nuestra jurisdicción, la concesión de honorarios de abogado a la parte que prevaleció en un litigio,

---

[12] La parte recurrente alegó que no procedía la determinación de temeridad que hizo el tribunal de instancia en su contra, debido a que en el caso de marras estaba en controversia una cuestión novel en nuestra jurisdicción. No le asiste la razón.

Aunque reiteradamente hemos resuelto que no procede la imposición de honorarios de abogado, por razón de temeridad, en un caso en el cual una parte acude al tribunal, o se defiende, en relación con una controversia de hechos que resulta de "primera impresión" en nuestra jurisdicción, *Rodríguez v. John Hancock Mutual Life*, 110 D.P.R. 1, 8 (1980), también hemos señalado que, ante una situación de hechos innegables, o un estado de derecho claro, el hecho de que se trate de un asunto nunca antes considerado en nuestra jurisdicción no constituye excusa para una conducta o actuación obstinada, contumaz, temeraria o frívola. *Corpak, Art Printing v. Ramallo Brothers*, 125 D.P.R. 724 (1990). Véase, además, J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1986, Vol. II, pág. 245.

como regla general, depende exclusivamente de la determinación que haga el magistrado que presidió el proceso respecto a si la parte perdidosa o su abogado actuaron o no en forma temeraria o frívola. *Corpak, Art. Printing v. Ramallo Brothers*, supra. Al cuantificar esos honorarios, los tribunales de instancia pueden tomar en consideración factores tales como la naturaleza del litigio, las cuestiones de derecho relacionadas en la cuantía en controversia, el tiempo invertido, los esfuerzos y actividad profesional que hayan tenido que desplegarse y la habilidad y reputación de los abogados involucrados. *Serrano Vda. de Cartagena v. Lugo Ramírez*, 83 D.P.R. 300, 303 (1961); *Pan American v. Tribunal Superior*, 100 D.P.R. 413, 420 (1972); *Veve v. Municipio de Fajardo*, 18 D.P.R. 764, 771 (1912); *Corpak, Art. Printing v. Ramallo Brothers*, supra. Sin embargo, deberá tenerse presente que el grado o intensidad de la conducta temeraria o frívola es el criterio o factor determinante y crítico que tienen que tomar en consideración dichos tribunales al determinar la cuantía de los honorarios de abogado. *Corpak, Art. Printing v. Ramallo Brothers*, supra.

Al tomar en consideración las circunstancias particulares de este caso, en el cual la cuantía en controversia era sólo $67,000 y en el que no hubo un juicio en sus méritos —ya que el tribunal de instancia lo resolvió mediante el mecanismo de sentencia sumaria— la cuantía fijada de $10,000 resulta excesiva.

Por las razones expuestas anteriormente, *se dictará sentencia de acuerdo con lo aquí resuelto, se modificará la cuantía otorgada por concepto de honorarios de abogados de $10,000 a $5,000 y, así modificada, se confirma la sentencia emitida por el Tribunal Superior, Sala de San Juan.*